487 A.2d 271

**LUMBERMEN'S MUTUAL CASUALTY COMPANY et al.**

v.

**INSURANCE COMMISSIONER of the State of Maryland.**

**No. 161, Sept. Term, 1982.**

Court of Appeals of Maryland.

Feb. 4, 1985.

Steven R. Silberman, Baltimore (Horn, Dressel & Bennett, P.A., Baltimore, on brief), for appellants.

Thomas P. Barbera, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, on brief), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON * and COUCH, JJ.

ELDRIDGE, Judge.

This opinion encompasses three separate administrative proceedings which were consolidated for purposes of judicial review. In all three cases, insurance companies sent

---

* DAVIDSON, J., participated in the hearing of the case and in the conference in regard to its decision, but died prior to the adoption of the opinion of the Court.

notices of proposed nonrenewal of automobile liability insurance policies; the insureds protested and requested hearings before the Insurance Commissioner; after hearings, the Insurance Commissioner disallowed the proposed actions and ordered the insurers to renew the policies, and the insurers sought judicial review.[1] The controversy in each of the cases is the same. It involves two distinct sets of statutory provisions concerning automobile liability insurance ratemaking and the cancellation or nonrenewal of automobile liability insurance policies. Before setting out the facts of the cases, we shall briefly review the pertinent statutory sections.

## I.

Section 242 of the Insurance Code [2] specifically deals with rates, rate making, rating plans, etc., in certain lines of insurance, including automobile liability insurance. Section 242(c) provides that all rates shall be made in accordance with the principles set forth in that section. Subsection (c)(1) states that in ratemaking, consideration shall be given to various factors, including loss experience, expenses, and underwriting profit. Subsection (c)(2) mandates, *inter alia*, that rates not be "inadequate." Different classifications reflecting variations among risks, having a demonstrable effect on losses, are authorized by subsection (c)(4). Under § 242(c)(6), the Insurance Commissioner is authorized to disapprove of rate filings unless the filer "demonstrates that the proposed rate is not excessive or inadequate or unfairly discriminatory." [3]

---

1. The two insurance companies involved in these cases are the American Motorists Insurance Company and the Lumbermen's Mutual Casualty Company. Both of these companies are part of the "Kemper Group."

2. Maryland Code (1957, 1979 Repl.Vol., 1984 Cum.Supp.), Art. 48A.

3. The language of § 242(c) is as follows:
    "(c) *Making of rates.*—All rates shall be made in accordance with the following principles:

Section 242(d) contains detailed requirements concerning the filing of rates and rating plans with the Insurance Commissioner, including the filing of "every modification of" any "class rate, rating schedule or rating plan."[4] Ex-

> (1) Due consideration shall be given to (i) past and prospective loss experience within and outside this State; (ii) conflagration and catastrophe hazards, if any; (iii) past and prospective expenses both countrywide and those specially applicable to this State; (iv) underwriting profits; (v) contingencies; (vi) investment income from unearned premium reserve and reserve for losses; (vii) dividends, savings or unabsorbed premium deposits allowed or returned by insurers to their policyholders; (viii) and to all other relevant factors within and outside this State.
>
> (2) Rates shall not be excessive, inadequate, or unfairly discriminatory.
>
> (3) The systems of expense provisions included in the rates for use by any insurer or group of insurers may differ from those of other insurers or groups of insurers to reflect the requirements of the operating methods of any such insurer, or group with respect to any kind of insurance, or with respect to any subdivision or combination thereof for which subdivision or combination separate expense provisions are applicable.
>
> (4) Risks may be grouped by classifications for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in hazards or expense provisions, or both. The standards may measure any difference among risks that are demonstrated objectively to the Commissioner to have had a direct and substantial effect upon losses or expenses. However, no rate may be based partially or entirely on geographic area itself, as opposed to underlying risk considerations, even though expressed in geographic terms.
>
> (5) Uniformity among insurers in any matters within the scope of this subsection is neither required or prohibited.
>
> (6) Unless the filer demonstrates that the proposed rate is not excessive or inadequate or unfairly discriminatory, the Commissioner may disapprove the filing."

By Ch. 737 of the Acts of 1984, the General Assembly added new sections 244 through 244V to the Insurance Code. These are new provisions concerning rate making, in effect from 1984 to 1986, and, while effective, they render certain provisions of § 242 inapplicable. Ch. 737 has no application to the cases at bar. Moreover, even if it did, the essential reasoning and result of this opinion would be the same.

4. Section 242(d)(1) states:

> "(d) *Rate filings.*—(1) Every insurer, except as otherwise provided below, shall file with the Commissioner every manual, policy form, endorsement, minimum rate, class rate, rating schedule or rating plan and every other rating rule, and every modification of any of

tensive provisions relating to the approval or disapproval of filings are set forth in § 242(f). Section 242B of the Insurance Code provides for judicial review of the Commissioner's decisions under § 242.

The other set of statutory provisions relevant to these cases is contained in §§ 234A through 240H of the Insurance Code and concerns underwriting practices, discrimination in underwriting, cancellation or nonrenewal of policies, and related matters. The two pertinent sections are 234A and 240AA.

Section 234A sets forth substantive underwriting requirements for insurance risks, including automobile insurance risks.[5] Thus it prohibits refusals to underwrite, cancella-

---

the foregoing which it proposes to use. Every filing shall state the proposed effective date thereof and shall indicate the character and extent of the coverage contemplated."

5. Section 234A provides as follows:

"(a) No insurer, agent or broker shall cancel or refuse to underwrite or renew a particular insurance risk or class of risk for any reason based in whole or in part upon race, color, creed, sex, or blindness of an applicant or policyholder or for any arbitrary, capricious, or unfairly discriminatory reason. In the case of a cancellation of or refusal to renew a policy, provided the insured requests of the Commissioner that a review be undertaken of the insurer's action prior to the effective date of termination of the policy, and provided the Commissioner initiates action toward issuance of a finding in accord with § 234C, such policy shall remain in effect until such finding is issued. No insurer, agent or broker may cancel or refuse to underwrite or renew a particular insurance risk or class of risk except by the application of standards which are reasonably related to the insurer's economic and business purposes. At any hearing to determine whether there has been a violation of this section, the burden of persuasion shall be upon the insurer to demonstrate that the cancellation, or refusal to underwrite or renew is justified under the standards so demonstrated.

(b) No insurer shall require the existence of special conditions, facts, or situations as a condition to its acceptance or renewal of, a particular insurance risk or class of risks in an arbitrary, capricious, unfair, or discriminatory manner based in whole or part upon race, creed, color, sex, religion, national origin, place of residency, or blindness or other physical handicap or disability. Actuarial justification may be considered with respect to sex.

(c) No insurer, agent or broker shall make any inquiry as to race, creed, color, or national origin in any insurance form, question-

tions of policies, or nonrenewals of policies based in whole or in part on race, color, creed, sex, or for any arbitrary, capricious or unfairly discriminatory reason. Prior to 1974, the thrust of the section was to proscribe discriminatory underwriting. *See* the discussion in *Gov't Employees Ins. v. Ins. Comm'r*, 273 Md. 467, 478–480, 330 A.2d 653 (1975).

By Ch. 752 of the Acts of 1974, however, the Legislature amended § 234A and went far beyond a proscription of discrimination in underwriting. That statute added a requirement that no insurer may cancel or refuse to underwrite or renew an insurance risk "except by the application of standards which are reasonably related to the insurer's economic and business purposes." Ch. 752 also added the provision that, at "any hearing to determine whether there has been a violation of this section, the burden of persuasion shall be upon the insurer to demonstrate that the ... refusal to ... renew is justified under the standards so demonstrated." The preamble to Ch. 752 states that insurers' underwriting decisions must

"be made solely on the basis of a reasonable application to relevant facts of underwriting principles, standards and rules that can be demonstrated objectively to measure the probability of a direct and substantial adverse effect upon losses or expenses of the insurer *in light of the approved rating plan or plans of the insurer then in effect....*" (Emphasis added.)

As pointed out in *Gov't Employees Ins. v. Ins. Comm'r, supra*, 273 Md. at 482–483, 330 A.2d 653, in referring to the

naire or other manner of general information which would pertain to any application for insurance.

(d) With respect to automobile liability insurance, an insurer may not:

(1) Cancel, refuse to renew or otherwise terminate coverage for any automobile insurance risk because of the existence of a traffic violation or accident more than three years old on the date the policy or renewal is effective; or

(2) Refuse to underwrite any automobile insurance risk because of a traffic violation or accident more than five years old on the date of application."

new statutory language and the preamble, the General Assembly in Ch. 752 "wished to move beyond the historic prejudices already proscribed by § 234A, [and] it did so in explicit fashion."

In 1977 the Legislature further restricted an automobile insurer's right to nonrenew a policy, by amending § 234A to prohibit nonrenewals because of the existence of traffic violations or accidents more than three years old. *See* Ch. 314 of the Acts of 1977.

Whereas § 234A contains the substantive limitations on an insurer's underwriting decisions, § 240AA prescribes procedures and procedural limitations with regard to the cancellation or nonrenewal of motor vehicle liability insurance policies. The section states that an insurer who intends to nonrenew a policyholder must send written notice to the policyholder on or before forty-five days prior to the proposed effective date of the nonrenewal informing the policyholder of the insurer's reasons for nonrenewal.[6] The

---

**6.** Section 240AA(a) and (b) states as follows:

"§ 240AA. Procedure for cancellation, nonrenewal, increase in premium or reduction of coverage under motor vehicle liability insurance policy.

"(a) *Compliance with article.*—Except in accordance with the provisions of this article, no insurer other than the Maryland Automobile Insurance Fund shall (i) cancel or fail to renew a policy of motor vehicle liability insurance issued in this State, as to any resident of the household of the named insured, for any reason other than nonpayment of premium, or (ii) increase a premium for any coverage on any such policy unless the increase is part of a general increase in premiums approved by the Commissioner and does not result from a reclassification of the insured, or (iii) reduce the coverage under any such policy unless the reduction is part of a general reduction in coverage approved by the Commissioner or to satisfy the requirements of §§ 539 through 541 of this article, inclusive.

(b) *Notice to insured.*—An insurer intending to take an action subject to the provisions of this section shall, on or before forty-five days prior to the proposed effective date of the action, send written notice of its intended action to the insured at his last known address. A written notice of cancellation or nonrenewal shall be sent by certified mail. All other notices of action subject to the provisions of this section shall be sent by certificate of mailing.

insured has a right to protest the proposed nonrenewal, and such protest stays the nonrenewal pending a final determination by the Insurance Commissioner.[7]   In addition, the

---

The notice shall be in triplicate, and shall state in clear and specific terms, on a form approved by the Commissioner:

(i) The proposed action to be taken, including, if the action is an increase in premium or reduction in coverage, the amount of increase and the type of coverage to which it is applicable, or the type of coverage reduced and the extent of the reduction;

(ii) The proposed effective date of the action;

(iii) The insurer's actual reason or reasons for proposing to take such action.   The statement of reasons shall be sufficiently clear and specific so that a person of average intelligence can identify the basis for the insurer's decision, without making further inquiry. Generalized terms such as 'personal habits,' 'living conditions,' 'poor morale,' or 'violation or accident record' shall not suffice to meet the requirements of this section;

(iv) If there is coupled with the notice an offer to continue or renew the policy in accordance with § 240C–1 hereof, the name of the person or persons to be excluded from coverage, and what the premium would be if the policy is continued or renewed with such person or persons excluded from coverage;

(v) The right of the insured to replace the insurance through the Maryland Automobile Insurance Fund; and the current address and telephone number of the fund;

(vi) The right of the insured to protest the proposed action and request a hearing thereon before the Commissioner by signing two copies of the notice and sending them to the Commissioner within ten days after receipt of the notice;

(vii) That if a protest is filed by the insured, the current insurance will remain in effect until a determination is made by the Commissioner upon payment of any lawful premium due or becoming due prior to the determination;

(viii) The authority of the Commissioner to award reasonable counsel fees to the insured for services rendered to the insured in connection with any such hearing if he finds the proposed action of the insurer to be unjustified."

7.   Subsections (d) and (e) of § 240AA provide as follows:

"(d) *Protest.*—An insured shall have the right to protest the proposed action of the insurer by signing two copies of the notice and sending them to the Commissioner within 30 days after receipt of the notice.   The Commissioner shall, upon receipt of a protest, notify the insurer of the filing of the protest.

(e) *Stay of proposed action.*—A protest duly filed shall stay the proposed action of the insurer pending a final determination thereof by the Commissioner, and the insurer shall keep in full force and effect the same coverage and premium in effect on the day the notice of proposed change was sent until such final determination is

insured has a right to a hearing before the Insurance Commissioner or his designee. Section 240AA(f) reiterates the requirement in § 234A, that at such "hearing the insurer has the burden of proving its proposed action to be justified...." [8]

## II.

The facts in the three cases before us are as follows.

### The Carter Case

On May 13, 1981, the American Motorists Insurance Company sent a notice to one of its insureds, Judith Carter of Timonium, Maryland, informing Mrs. Carter that the

---

made, provided that any lawful premium due or becoming due prior to such determination is paid."

**8.** Subsections (f), (g), and (h) of § 240AA read as follows:

"(f) *Dismissal of protest; hearing on protest.*—The Commissioner shall make a determination from the information contained in the notice whether the protest has merit and, upon such a finding, shall either dismiss the protest or disallow the action of the insurer and shall promptly notify the insurer and the insured in writing of his action. The aggrieved party, within 30 days after receipt of the Commissioner's notice of action, may request a hearing. The Commissioner shall conduct a hearing within a reasonable time after the request and shall give not less than 10 days written notice of the time and place of the hearing. At the hearing the insurer has the burden of proving its proposed action to be justified, and, in doing so, may rely only upon the reasons set forth in its notice to the insured.

(g) *Commissioner's decision after hearing; delegation of Commissioner's powers and duties.*—The Commissioner shall issue an order within 30 days after termination of the hearing. If the Commissioner finds the proposed action to be justified, he shall dismiss the protest and allow the proposed action to be taken on the later of (i) its proposed effective date, or (ii) twenty days after the date of the determination. If the Commissioner finds the proposed action to be unjustified, he shall disallow the action, and may, in addition, order the insured to pay reasonable counsel fees incurred by the insured for representation at the hearing as he may deem appropriate. The Commissioner may delegate the duties and powers conferred in this section to one or more employees or hearing examiners.

(h) *Appeal.*—Any party may appeal to a court of law the decision of the Commissioner in accordance with § 40 of this article."

insurer did not intend to renew her automobile liability insurance policy when it expired on July 1, 1981. The notice (as explained by the insurer's representative at the later hearing) indicated that the nonrenewal decision was based on two incidents occurring in 1979 and 1981. On October 17, 1979, the insured automobile, operated by Mrs. Carter, struck another vehicle in the rear, causing property damage to both vehicles, although there were no personal injuries. Based upon this incident, Mrs. Carter was convicted in the District Court of Maryland of following too closely. On March 6, 1981, the insured automobile, again operated by Mrs. Carter, slid on some ice, spun around, and struck another vehicle. This too caused property damage to both vehicles, but there were no personal injuries. Mrs. Carter was not convicted of any traffic offense based on this second incident, although the insurer did pay a property damage claim made by the owner of the other vehicle.[9]

The nonrenewal notice sent to Mrs. Carter went on to refer to a study done by the State of California, which concluded that a driver with a traffic violation over a three year period was 1.81 times more likely to have an accident within the next three years than a driver who had no traffic violations, and that the average driver is involved in an accident only once every twelve years. The nonrenewal notice then pointed out that the insurance company was entitled under its filed rating plan to surcharge Mrs. Carter for the two accidents but that

"comparison of the permitted surcharge with the probability of future loss through accident reveals that the company will not be compensated adequately based on the premium rate and the surcharge authorized."

The nonrenewal notice concluded by stating that maintaining an insured such as Mrs. Carter "has a direct adverse

---

**9.** At the subsequent hearing the representative of the insurer stated that she had no knowledge as to whether or not Mrs. Carter was at fault in connection with the March 6th accident, other than the fact that the insurer's claim department paid the claim.

bearing on the economic and business purpose of the company."

Mrs. Carter protested the proposed action of American Motorists Insurance Company and requested a hearing before the Insurance Commissioner. In addition, she submitted a detailed statement to the Insurance Commissioner for the purpose of showing that the accident on March 6, 1981, was not her fault.

At the subsequent administrative hearing the sole witness for the insurance company was Ruth Sheehan, identified as "Underwriting Supervisor, Kemper Insurance." Miss Sheehan testified that the American Motorists Insurance Company views any Maryland driver with more than one accident or traffic violation within a three year period as an unacceptable risk.[10] She stated that this determination was based on studies, reports and "the company's own experience." Nevertheless, no studies or reports were introduced in evidence, and no data or evidence was submitted concerning the company's experience. Miss Sheehan did testify that a study conducted by the California Division of Motor Vehicles

"concluded that the average driver is involved in an accident every twelve years. And that that single predictor of accident involvement is the driver's conviction record. An operator convicted of one conviction within a three-year period has 1.95 times the increased probability of an accident than does the violation-free driver. And the driver that's involved in two accidents within a three-year period has 2.93 times the increased probability of another accident than does the accident-free operator."

Miss Sheehan went on to testify that American Motorists would be able, under its rating plan filed with the Maryland Insurance Commissioner, to surcharge Mrs. Carter for both

---

**10.** According to Miss Sheehan's testimony, "accident" in this context means any accident where the insurer paid a claim.

of the accidents. Her direct testimony, under the questioning by the insurer's counsel, concluded as follows:

"Q Is the—are the premiums the company is allowed to charge, including the surcharge for these two accidents, sufficient to offset the increased risk of loss indicated by a person with Miss Carter's driving record?

"A No, because we feel in comparison to the surcharge to the increased probability of future loss, does not compensate the company for the increased risk.

"Q You're saying that the increased risk is greater than is the increased premium that is allowed to be charged?

"A That's correct.

"Q Does the company take this—will the company take the same action when any of its insureds in Maryland, that it is aware, has more than one accident or violation within a three-year period?

"A It most certainly does.

"Q And, were any factors other than the accidents and violations considered when the company sent out the notice of intent not to renew?

"A No."

Following the hearing the Insurance Commissioner, by the Hearing Officer, issued a written order concluding that nonrenewal of Mrs. Carter's policy "is in violation of Sections 234A, 240AA of Article 48A" and ordering that "the Licensee [insurer] continue in effect the insurance coverages." Among the "Findings of Fact," the Hearing Officer found that the insurer "has failed to produce evidence which demonstrates that its underwriting standards are reasonably related to its economic and business purposes." In addition, the Hearing Officer found that the "licensee has a surcharge plan it can apply to the accidents of Mrs. Carter."

### The Matthews Case

James E. Matthews of Baltimore City had an automobile liability insurance policy issued by Lumbermen's Mutual

Casualty Company. On August 11, 1981, Lumbermen's sent Mr. Matthews a "Notice Of Intent Not To Renew" which was virtually identical to the notice sent by American Motorist in the *Carter* case, although the incidents forming the basis for the decision were three traffic violations in 1980. As in the *Carter* case, the notice sent to Mr. Matthews referred to the study done in California, recited that the insurer was entitled to surcharge Mr. Matthews under its filed rating plan, complained that the surcharged rates under the rating plan were inadequate, and stated that keeping an insured such as Mr. Matthews "has a direct adverse bearing on the economic and business purpose of the company."

Mr. Matthews protested the intended action and requested a hearing before the Insurance Commissioner or his designee. At the administrative hearing, the only witness for Lumbermen's was again Ruth Sheehan, "underwriting supervisor" for the Kemper Insurance Group. Miss Sheehan initially testified that the reason for the nonrenewal was that Mr. Matthew's driving record, dated September 9, 1981, disclosed three traffic convictions, namely an automatic signal violation on January 30, 1980, exceeding the speed limit on May 31, 1980, and failure to obey a stop or yield sign on October 26, 1980. Miss Sheehan reiterated that, under Lumbermen's underwriting guidelines, "any operator with more than one accident or conviction within a three year period is an unacceptable operator" so as to "disqualify this person for continued coverage with Lumbermen's." She stated again that this guideline was based on the company's "own experience as well as various studies," including the "California study." As in the *Carter* case, Miss Sheehan offered no data or evidence with respect to the company's experience, and none of the "studies" was introduced in evidence. Miss Sheehan did say that, "among major conclusions reached by this [California] study are" that the "best single predictor of accident involves conviction record," and that an "operator with three moving traffic violations within a three year period has 3.54 times

an increased probability of an accident than does a violation free driver."

Miss Sheehan acknowledged that Lumbermen's rating plan on file covered the instant situation, that it authorized a surcharge for certain initial traffic violations but not others, and that it allowed surcharges for Mr. Matthews's second and third violations.[11] She went on to testify that the company would refuse to renew any of its drivers in Maryland who have more than one moving traffic violation over a three year period, despite its ability to surcharge under the rating plan. She stated that the amount of the surcharge under the rating plan "does not compensate the company for the increased risk."

Mr. Matthews testified that he had been driving in Maryland since 1963 when he was discharged from the Air Force, that he had never had an accident, and that he had had no traffic violations on his record since 1963 except for the three tickets which he received and paid in 1980. Even though the study itself was not in evidence, Mr. Matthews stated that the California study relied on by Lumbermen's was "done ... sometime before 1968." Mr. Matthews also disputed Miss Sheehan's testimony concerning the "conclusions" of the California study. Mr. Matthews submitted into evidence Lumbermen's current rating plan which the company had filed with the Insurance Commissioner and the Commissioner had approved.

At the conclusion of the hearing, Lumbermen's counsel argued that the ability of the insurer to surcharge under its rating plan did not furnish a ground for upholding Mr. Matthews's protest, as "the amount of the surcharge does not adequately compensate the company." Counsel made the "proffer" that, were she asked, Miss Sheehan would testify that the surcharges under the plan were adequate only when there were "family automobile policies in which

---

11. Lumbermen's filed rating plan was identical to that of American Motorists' with regard to surcharges based on violations or accidents.

you have more than one driver, each having one ... accident or violation," but with no individual driver having more than one accident or violation.

Subsequently the Insurance Commissioner, by the Hearing Officer, filed an order finding that "the Licensee [insurer] has failed to show how this risk exceeds the surcharge capability of the Licensee's approved rating plan." The order concluded that Lumberman's had violated Art. 48A, §§ 234A and 240AA, and it required that Lumbermen's continue in effect Mr. Matthews's coverage.

### The Grainger Case

Lumbermen's had also issued an automobile liability insurance policy to Jana Grainger of Laurel, Maryland. The insurer, on May 7, 1981, sent Miss Grainger a nonrenewal notice which referred to two traffic violations in 1980. Otherwise the notice was identical to the notices in the other two cases, referring to the inadequacy of the surcharges under the rating plan, etc.

As did the insureds in the other two cases, Miss Grainger protested and requested a hearing. The hearing was similar to those in *Carter* and *Matthews,* except that Lumbermen's sole witness was Donald M. Schlear, identified as the "personalized underwriting supervisor with the Kemper Insurance Group." Mr. Schlear testified that the nonrenewal of Miss Grainger's policy was because of a conviction on April 17, 1980, for exceeding the speed limit and a conviction on May 16, 1980, for failure to obey a traffic device. Mr. Schlear also testified that Lumbermen's refuses to renew all policy holders who have more than one moving violation over a three year period, and that this underwriting decision is based on the insurer's own "experience" and on "studies." Again, no data or evidence concerning Lumbermen's experience was offered, and no studies were offered into evidence. Mr. Schlear also testified that under its filed rating plan Lumbermen's could surcharge for both of Miss Grainger's traffic violations but that the surcharges under the plan do "not compensate the company for the

increased risk." He concluded by testifying that the surcharges in the rating plan are not "adequate to provide sufficient premiums to offset the risk of loss shown by a driver with two violations within a three-year period."

Miss Grainger testified concerning the circumstances underlying the two traffic convictions, stated that she had received no traffic tickets since those convictions, and testified that she had never been involved in a traffic accident. After the testimony had concluded, the Hearing Officer found that the nonrenewal was "in violation of Section[s] 234A and 240AA, and the company's action will be disallowed, and the company will be allowed to surcharge for the violations but must remain on the risk." These findings were later embodied in a written order of the Insurance Commissioner, signed on behalf of the Commissioner by the Hearing Officer.

### III.

The two insurers sought judicial review of all three decisions in the Baltimore City Court (now the Circuit Court for Baltimore City). The cases were consolidated, and the court upheld the administrative decisions. The insurers took appeals to the Court of Special Appeals, and this Court issued a writ of certiorari prior to argument in the intermediate appellate court.

It is clear in all three of these cases that the gist of the insurers' complaint, and the basis for the proposed nonrenewals, was the insurers' belief that the surcharge rates in the filed and approved rating plans were insufficient with respect to Maryland insured drivers having more than one accident or violation over a three year period. The companies' position was that the automobile liability policies of *all* of their Maryland insured drivers who fell within this allegedly inadequate rating category should not be renewed. The argument is that the asserted rate inadequacy for this broad category of insureds is "reasonably related to the

insurer's economic and business purposes" within the meaning of § 234A, as amended by Ch. 752 of the Acts of 1974, and that, therefore, it is justification under that section for the nonrenewals.

The Insurance Commissioner, both at the administrative level and before this Court, has rejected the insurers' position on alternate grounds. *First,* the Commissioner found that the insurers did not, factually, meet their burden of proving that the surcharge rating plan was inadequate or that, because of the driving records of the three insureds, continuation of the insurance presented risks for which the insurers would not be compensated. The Commissioner contended that this finding is supported by the record. *Second,* the Commissioner has taken the position that, as a matter of law, when an automobile liability insurer's filed and approved rating plan provides surcharges for certain underwriting factors which increase the risk of accident, the insurer cannot ignore its surcharge plan and refuse to renew an insured's policy because of the presence of those identical underwriting factors. In other words, the asserted inadequacy of the rates in an insurer's approved rating plan is not encompassed by § 234A's justification for nonrenewal.

In general, we agree with both arguments by the Insurance Commissioner. Therefore we shall affirm.

## IV.

Even if it be assumed, arguendo, that the inadequacy of an insurer's surcharges under its filed and approved rating plan could, as a matter of statutory interpretation, constitute justification for nonrenewal under § 234A as that section was amended by Ch. 752 of the Acts of 1974, the statutory provisions still place the burden of proving justification upon the insurer. Here, the Insurance Commissioner found that the insurers had not met the burden.

■ Under § 240AA(h) and § 40 of the Insurance Code, the basic standard for reviewing an administrative finding by the Insurance Commissioner is whether the finding is supported by "substantial evidence." This means whether "a reasoning mind reasonably could have reached the factual conclusion the agency reached," *Prince George's Doctors' Hospital v. Health Services Cost Review Commission*, 302 Md. 193, 200–201, 486 A.2d 744 (1985), quoting from *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 512, 390 A.2d 1119 (1978), and *Insurance Comm'r v. Nat'l Bureau*, 248 Md. 292, 309, 236 A.2d 282 (1967).

■ In our view, a reasoning mind could have reasonably found that the insurers failed to prove that the surcharges under their rating plans were insufficient to compensate for the increased risk presented by the traffic violations or accidents in these cases. Other than a reference to the amount of the surcharges for each of the three insureds specified in the filed and approved rating plans, not a shred of evidence was introduced concerning the amount of premium revenue which would likely be produced from the companies' Maryland insureds in the rating classifications having surcharges for two or more violations or accidents over a three year period. Absolutely no evidence was presented with regard to the additional compensation to the companies from the surcharges, other than the bald conclusory statement by each of the two underwriters that it would be "inadequate." Moreover, no evidence was introduced concerning the loss experience of these two companies with insureds having more than one traffic violation or accident over a three year period. None of the "studies" or "reports" referred to was introduced into evidence.

There was no data or factual basis, in any of these three cases, for the Insurance Commissioner to have concluded that the increased premiums available under the rating plans would not have adequately compensated the insurance companies for the asserted increased risk.

## V.

■ There is a more fundamental reason, however, why the insurance companies cannot prevail in these cases. If the insurers had demonstrated the amount of increased risk presented by these three insureds, and had proven that the surcharged rates in the filed and approved rating plans were inadequate to compensate the insurers for such increased risk, this would not, under the circumstances here, have furnished justification for the nonrenewals under § 234A, as amended by Ch. 752 of the Acts of 1974. The justification for cancellation or nonrenewal set forth in that statute, namely that the insurer must demonstrate that the standards applied "are reasonably related to the insurer's economic and business purposes," does not encompass the situation where the gist of the insurer's complaint is that its filed and approved rating plan, covering the specific situation involved, is inadequate. We do not believe that the Legislature intended that a proceeding under §§ 234A and 240A could be converted into a rate case.

The legislative intent in this regard is clearly shown by the language of Ch. 752 of the Acts of 1974. As previously set forth, the Preamble to Ch. 752 states that cancellations and nonrenewals must be on the basis of "principles, standards and rules that can be demonstrated objectively to measure the probability of a direct and substantial adverse effect upon losses or expenses of the insurer *in light of the approved rating plan or plans of the insurer then in effect* ...." (Emphasis added.) In the instant cases, instead of applying an underwriting standard "in light of the approved rating plan," the insurers have attempted to attack the approved rating plan.

Also, as the language of Ch. 752's Preamble underscores, the justification for nonrenewal must relate to "the probability of a direct and substantial adverse effect upon losses or expenses of the insurer." But, under the ratemaking statute, § 242, where a rating plan has been approved by

the Insurance Commissioner, and such approval has become final,[12] the rating plan as a matter of law is "adequate." As previously discussed, the Insurance Commissioner is precluded from approving a rating plan unless it is adequate. Permitting an insurer to challenge the adequacy of its finally approved rating plan in a proceeding under §§ 234A and 240AA, would create a conflict between those sections and § 242.

Even if the language of § 234A, as amended by Ch. 752 of the Acts of 1974, were less clear, and if the general language of § 234A arguably covered the insurers' complaints in the present cases, the result would not be different. Section 242 is a specific statute dealing with rating plans and their adequacy. Section 242(d) expressly authorizes an insurer to file with the Insurance Commissioner a proposed modification of its rating plan if it is dissatisfied with the plan.

It is an often repeated principle that a specific statutory provision governs over a general one. *Director of Fin., Pr. Geo's Co. v. Cole,* 296 Md. 607, 635, 465 A.2d 450 (1983); *Zellinger v. CRC Dev. Corp.,* 281 Md. 614, 625, 380 A.2d 1064 (1977); *Prince George's Co. v. Laurel,* 262 Md. 171, 182–183, 277 A.2d 262 (1971); *Rafferty v. Comptroller,* 228 Md. 153, 158, 178 A.2d 896 (1962). Thus where one statutory provision specifically addresses a matter, and another more general statutory provision also may arguably cover the same matter, the specific statutory provision is held to be applicable and the general provision is deemed inapplicable. As this Court stated in *Maguire v. State,* 192 Md. 615, 623, 65 A.2d 299 (1949), quoting from *United States v. Chase,* 135 U.S. 255, 260, 10 S.Ct. 756, 757–758, 34 L.Ed. 117 (1890):

---

**12.** By final, we mean that no judicial review of the ratemaking decision has been sought, or, if an action for judicial review has been filed, the decision has been upheld.

" 'It is an old and familiar rule that "where there is, in the same statute, a particular enactment, and also a general one, which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment." *Pretty v. Solly,* 26 Beav. 610, per Romilly, M.R. . . . . This rule applies wherever an act contains general provisions and also special ones upon a subject which, standing alone, the general provisions would include.' "

To the same effect, *see Preiser v. Rodriguez,* 411 U.S. 475, 489, 93 S.Ct. 1827, 1836, 36 L.Ed.2d 439 (1973); *Bulova Watch Co. v. United States,* 365 U.S. 753, 761, 81 S.Ct. 864, 869, 6 L.Ed.2d 72 (1961); *Criminal Inj. Comp. Bd. v. Gould,* 273 Md. 486, 495, 331 A.2d 55 (1975); *Henry v. State,* 273 Md. 131, 133–134 n. 1, 328 A.2d 293 (1974).

Consequently, when an automobile liability insurer's complaint is over the adequacy of its filed and approved rating plan, § 242 is the specific statute dealing with the matter, and the controversy is not encompassed by §§ 234A and 240AA.

■ If the two insurers in these cases desired greater surcharges for insured drivers having more than one traffic violation or accident in a three year period, they could have applied for such modification of their rating plans under § 242. Or, if the insurers decided that they did not wish to insure such risks, they could similarly have sought to modify their rating plans by deleting this classification of risks. But, in our view, proceedings under § 234A and 240AA were not intended to encompass challenges to the adequacy of rating plans.

JUDGMENT AFFIRMED.

APPELLANTS TO PAY COSTS.