529 A.2d 841

**MEDICAL MUTUAL LIABILITY INSURANCE SOCIETY OF MARYLAND et al.**

v.

**Michael O. MAGAN.**

**No. 1370, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Sept. 2, 1987.

Kathleen M. Sweeney, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellant, Ins. Comr.

Michael L. Cohen (R. Harcourt Fulton and Kroll, Tract, Harnett, Pomerantz & Cameron, on brief), Baltimore, for appellant, Medical Mut. Liability Ins. Soc. of Maryland.

Steven Scott Stephens and Edward J. Birrane (Birrane, Harlan & Sharretts, on brief), Baltimore, for Magan.

Argued before WILNER, ROSALYN B. BELL and WENNER, JJ.

WENNER, Judge.

Appellants, Medical Mutual Liability Insurance Society of Maryland (Medical Mutual) and the Insurance Commissioner of the State of Maryland (Insurance Commissioner) urge us to reverse a judgment of the Circuit Court for Baltimore City (Ward, J.) which reversed a decision of the Insurance Commissioner. We shall affirm the judgment of the circuit court.

Appellee, Michael O. Magan (Magan), is a physician whose specialty is obstetrics and gynecology. From 1975 until 1984 his professional liability coverage was underwritten by Medical Mutual. When Magan applied to renew his coverage in 1984, he had one paid claim of $600 and had two other claims pending against him, for each of which Medical Mutual had established reserves of $100,000.

In May of 1984, Medical Mutual informed Magan that, due to his claims record, a surcharge of 100% would be added to his premium. Magan did not renew his coverage with Medical Mutual. Instead, he obtained coverage from another carrier. One year later, however, that carrier ceased underwriting obstetricians in Maryland, and Magan reapplied to Medical Mutual.

By that time, Medical Mutual had settled one of the claims against Magan [1] and raised its reserves from $100,000 to $175,000 for the remaining claim. Initially, Medical Mutual declined to cover Magan because of his claims history.

Magan protested and was invited to meet with Medical Mutual's "claims committee".[2] After the meeting, Medical

---

1. The claim was settled for $963,538.28 although the Health Claims Arbitration Board had awarded $1,500,000.

2. The circuit court found that the meeting with the claims committee was actually a meeting with Medical Mutual's Board of Directors to

Mutual offered Magan gynecological coverage only, with a 100% surcharge. Magan rejected the offer.

The present litigation began when Magan complained to the Insurance Commissioner that Medical Mutual had violated Md.Ann.Code Art. 48A, § 234A(a) (1986 Repl.Vol.)[3] by refusing to cover his obstetrical practice. Magan requested a hearing and later reiterated his request.

After receiving correspondence from Medical Mutual which purported to justify its decision not to underwrite Magan, the Insurance Commissioner's investigator advised Magan's attorney that his investigation had found no violations of the Insurance Code.

When Magan again requested a hearing which was not granted, he appealed to the circuit court, which conducted a three day hearing. Following the hearing, the trial judge filed a Memorandum Opinion and Order in which he found, *inter alia*, that Medical Mutual's refusal to underwrite Magan violated § 234A of the Insurance Code, and that Medical Mutual was required to make professional liability insurance available to all physicians licensed to practice in Maryland.

Upon this appeal, Medical Mutual and the Insurance Commissioner complain that all of the trial judge's findings are erroneous, but focus on his decision that Medical Mutual is required to insure all applicants. They also contend that Magan's appeal to the circuit court was untimely.

We shall hold that Magan's appeal was timely and, because we conclude that the trial judge correctly found that Medical Mutual had violated § 234A of the Insurance Code, we shall affirm the judgment of the circuit court. Therefore, although we have considered them, we need not decide

which no one, including Magan's counsel, was permitted to accompany Magan.

3. Unless otherwise noted, all further statutory references are to Art. 48A of the Annotated Code of Maryland, the "Insurance Code".

the other issues raised by Medical Mutual and the Insurance Commissioner.

## I.

■ We first address the timeliness of Magan's appeal from the Insurance Commissioner to the circuit court because if that appeal was not timely filed the court had no jurisdiction to consider the matter.

Magan's first complaint to the Insurance Commissioner about a violation of § 234A was on September 11, 1985. On November 7, 1985 Magan was advised that an investigation by the Insurance Commissioner had concluded that Medical Mutual had not violated § 234A.

Section 35(2) of the Insurance Code provides in part that:
(2) The Commissioner shall hold a hearing ... upon written demand therefor by a person aggrieved by any fact, threatened act or failure of the Commissioner to act, or by any report, rule, regulation or order of the Commissioner.... [U]nless postponed by mutual consent, such hearing shall be held within thirty (30) consecutive calendar days after receipt by the Commissioner of demand therefor.

When Magan received the November 7 letter, he became a "person aggrieved" within the meaning of § 35(2) and was entitled to demand a hearing. Magan's attorney, by a letter dated November 13, 1985, demanded a hearing.

Section 35(3) of the Insurance Code provides that:
(3) If within such thirty (30) day period the Commissioner does not either (i) grant the hearing, or (ii) issue his order refusing the hearing, as to such previous report, rule, regulation, or order as to which such person so claims to be aggrieved, then the hearing shall thereby be deemed to have been refused.

Inasmuch as Magan received no response to his demand for a hearing within thirty days, by operation of § 35(3), his demand for a hearing was **deemed refused on December 13, 1985.**

Thus, it was on December 13, 1985 that Magan was entitled to appeal to the circuit court pursuant to § 40(1) of the Insurance Code, which provides that:

... An appeal from the Commissioner shall be taken ... with respect to a matter which the Commissioner has refused a hearing. Any person ... whose pecuniary interests are directly and immediately affected by any such ... refusal and who is aggrieved thereby may, within 30 days after ... (iii) the Commissioner's refusal to grant a hearing, appeal from ... such refusal of a hearing.

Since his appeal was noted on December 30, 1985, well within thirty days from December 13, it was timely.

Moreover, the plain language of § 40(1) makes it clear that the appeal encompassed the entire subject matter upon which Magan was refused a hearing and was not just an appeal from the refusal to grant a hearing. The language of § 40(3) which provides in part that, where a hearing has been refused, the Commissioner is responsible on appeal for supplying the court with "all documents on file in his office directly relating to the matter as to which [the] appeal is taken" makes the language of § 40(1) all the more obvious.

In holding that this was a timely appeal, we reject appellants' argument that the date on which the appeal clock began to run was September 11, 1985. Such an argument ignores the clear wording of § 35(2).

To be sure, as we have said, Magan initially demanded a hearing on September 11 when he first complained to the Insurance Commissioner that Medical Mutual had violated § 234A, but that demand was meaningless because under § 35(2), Magan was not yet an "aggrieved person".

## II.

We believe that the circuit court was correct in concluding that Medical Mutual violated § 234A when it refused to provide Magan professional liability coverage for his obstet-

rical practice.[4] Section 234A(a) provides in pertinent part that, "[n]o insurer, agent or broker may cancel or refuse to underwrite or renew a particular insurance risk or class of risk except by the application of standards which are reasonably related to the insurer's economic and business purposes." Magan posits that when it refused him coverage Medical Mutual neither had nor applied any standards as required by § 234A(a).

In *Lumbermen's Mutual Casualty Company v. Insurance Commissioner*, 302 Md. 248, 487 A.2d 271 (1985), the Court of Appeals reviewed the legislative history of the "standards" provision of § 234A(a). The Court said:

> By Ch. 752 of the Acts of 1974, however, the legislature amended § 234A and went far beyond a proscription of discrimination in underwriting. That statute added a requirement that no insurer may cancel or refuse to underwrite or renew an insurance risk "except by the application of standards which are reasonably related to the insurer's economic and business purposes." ... The preamble to Ch. 752 states that insurers' underwriting decisions must
>
> > "be made solely on the basis of a reasonable application to relevant facts of underwriting principles, standards and rules that can be demonstrated objectively to measure the probability of a direct and substantial adverse effect upon losses or expenses of the insurer *in light of the approved rating plan or plans of the insurer then in effect....*" (emphasis added)

*Lumbermen's*, 302 Md. at 254, 487 A.2d 271.

The Court went on to rely on the language of the preamble to Ch. 752 and held that an insurer had violated § 234A(a) by refusing to renew the coverage of three

---

4. Magan made no allegations of § 234A violations to the Commissioner with respect to the 100% surcharge on his gynecological coverage. Thus, the trial judge correctly limited his findings to Medical Mutual's refusal to underwrite Magan's coverage for his obstetrical practice since no issues regarding Magan's gynecological coverage were before the court.

policyholders, instead of assessing the surcharge provided by its filed and approved rate plan, even though the surcharge might have been inadequate to cover possible economic loss. *See Lumbermen's*, 302 Md. at 267, 487 A.2d 271.

Recently, in *Crumlish v. Insurance Commissioner*, 70 Md.App. 182, 520 A.2d 738 (1987), we vacated an order of the Circuit Court for Baltimore City, that affirmed an order of the Insurance Commissioner, which found that an insurer had not violated any of the pertinent sections of Art. 48A in its attempted cancellation of an insurance policy. We did so because we held that the order of the Insurance Commissioner did not contain the "concise statement of the facts as found by the Insurance Commissioner and his conclusions therefrom ..." as required by Art. 48A, § 39. Because of our holding it was not necessary for us to reach the specific issue of whether the insurer had produced evidence that its underwriting standard (see footnote 5, *infra*) was reasonably related to its economic and business purposes. Nevertheless, "for the guidance of the Insurance Commissioner, on remand," we addressed the issue.

In determining whether Medical Mutual met its statutory burden, we again look to the language of the preamble to Ch. 752. The language of the preamble is particularly instructive because it describes a standard as something that can be "demonstrated objectively to measure the probability of a direct and substantial adverse effect upon losses or expenses of the insurer...."

■ The "standards" provision of § 234A(a) has two requirements. They are that a refusal to underwrite an insurance risk must be based upon the "application of standards," and those standards must be "reasonably related to the insurer's economic and business purposes." Thus, in a case governed by § 234A(a), not only must a standard be identified, but the standard must be shown to have been applied. That is, "the statute clearly requires that [the insurer] demonstrate objectively 'the possibility of a direct and substantial adverse effect upon losses or expenses of the insurer....'" *Crumlish*, 70 Md.App. at 190, 520 A.2d

738. With these requirements in mind, we turn to the case *sub judice.*

■ Throughout this litigation Medical Mutual has maintained that its underwriting guidelines, which were written and on file with the Insurance Commissioner, are the standards required by § 234A(a). An excerpt from those guidelines provides:

Because the statistical pool of experience for physicians professional malpractice is relatively small in comparison with traditional casualty lines, the underwriting standards must, perforce, be applied with some subjectivity. Simple objective criteria such as a certain number of accidents or speeding violations are inappropriate to medical malpractice underwriting. Underwriting standards and criteria include, but are not limited to, the following areas:

1. Specialty, including procedures in which involved
2. Training appropriate for specialty
3. Prior claim/loss history
4. States in which licensed and in which insured practices
5. Legal entity status (i.e., partnership, corporation, P.A., etc.)
6. Professional standing, including reduction, suspension, restriction, probation or revocation of hospital privileges, state license, narcotic license or membership in any professional society, or association
7. Incidents of conduct constituting unprofessional or criminal behavior
8. Disciplinary actions by the Commission on Medical Discipline

The guidelines go on to detail what is meant by the numbered criteria. For example, with respect to the first three criteria, underwriters are instructed to:

A. Review the specialty ... and the procedures normally associated with those specialties. If the techniques or

procedures are not usual to the specialty, ... secure full details.

\*　　\*　　\*　　\*　　\*　　\*

B.　Review the training and schooling undergone by the applicant....

\*　　\*　　\*　　\*　　\*　　\*

C.　Review any prior claim/loss history.　Secure the appropriate claim information and assess the liability, if any, of the physician.　Identify any of the following factors in making your assessment:

1.　Did the physician depart from the accepted standard of care?　Did that departure result in injury, loss, or damage to the patient?

2.　What was the opinion of the peer review (Med-Chi) panel, or experts who reviewed the case as to the standard of care rendered.

3.　Are there any patterns or trends noted in the physician's practice which could give rise to subsequent medical indicents, such as the same surgical procedure improperly performed, inadequate patient histories or workups, lack of informed consent, improper record keeping and documentation, etc.?

4.　Assess the number of claims which have occurred from inception of the physician's practice.　Evaluate the number which have occurred against the nature of the insured's specialty.　(e.g., an emergency room physician is exposed more frequently due to the nature of the specialty—treatment of traumatic injuries.)

5.　Review the Claims Representative's case summary, trial review or 30 day report for their assessment of the merits of the case.　Often the Claims Representative is the front-line contact with the physician and is the most well-versed person in the facts of the case, aside from the physician.　Did the physician cooperate with the representative and the company in preparing his defense?

Upon evaluation of the facts of the case, submit your recommendation to the Underwriting Manager....

These guidelines were submitted at trial as Medical Mutual's standards and, as we have said, Medical Mutual has consistently referred to them at all stages of the litigation as the standards required by § 234A. Further, the record specifically discloses that the focus of Medical Mutual's refusal to provide Magan coverage was guideline number 3—Magan's "prior claim/loss history." This was evident from the deposition testimony of Medical Mutual's Vice President of Underwriting, Paul H. Mathewson, as well as from his testimony at the hearing in the circuit court, where he repeatedly cited the three claims against Magan as the reason why Magan was denied coverage, and where he testified that:

> ... the existence of past claims experience, whether it be loss frequency, loss severity, or loss frequency and severity combined, ... is the most critical and important predictor of the possibility of future loss, and hence, is the most important standard to be judged in weighing the acceptability or nonacceptability of an underwriting risk.

We have no doubt that the claims history of an applicant for professional liability insurance is of great importance in assessing whether the risk presented is acceptable. Nevertheless, "claims history" is not a standard within the contemplation of § 234A(a). "Claims history" is a vague term which by its very nature requires subjective interpretation. Indeed, the guidelines on their face direct that they be applied with "some subjectivity." With respect to "claims history", the underwriters are instructed by paragraph C. of the guidelines to "review" the prior claim/loss history, to "secure ... information," and to evaluate facts. They are given no objective factors, however, such as a number of claims or an amount of paid claims that would trigger certain results. There is no objective supposition that could be used to measure the likelihood of Medical Mutual's

suffering an economic loss.[5] The guidelines, particularly as they speak to "claims history", cannot be objectively, uniformly, and fairly applied, as we believe the statute requires. Therefore, they fail to satisfy the first requirement of the "standards" provision of § 234A(a).

■ Inasmuch as "claims history" is not a standard, the second requirement is also not met. In *Crumlish,* we pointed out, quoting from *Lumbermen's,* 302 Md. at 254, 487 A.2d 271, that an insurer must produce evidence which "demonstrate[s] objectively 'the probability of a direct and substantial adverse effect upon losses or expenses of the insurer in light of the appropriate rating plans of the insurer then in effect ...'" in order to satisfy the statute. *Crumlish,* 70 Md.App. at 190, 520 A.2d 738. We also said that for the evidence to be adequate it must answer at least the following questions:

1. What is the statistical basis for the supposition [giving rise to the standard]?

2. How valid is any such statistical evidence?

3. If there is statistical validity to the supposition, what direct and substantive adverse effect would it have upon [the insurer's] losses and expenses in light of its current approved rating plan?

*Id.*

Not only is the record before us devoid of any evidence which could answer these questions, but, given the lack of any objective supposition, we do not believe that the *Crumlish* test can even be applied in the case *sub judice.* Accord-

---

5. Examples of objective suppositions which give rise to standards can be found in *Crumlish* and *Lumbermen's.* In *Crumlish* the supposition was that a driver of two or more accidents within a 24–month period is almost three times more likely to be involved in another accident within the following twelve months. Such a driver was, therefore, subject to the cancellation of his insurance policy. *Crumlish,* 70 Md.App. at 184, 520 A.2d 738. In *Lumbermen's,* the supposition was that a driver with a traffic violation within a given three year period was almost two times more likely to have an accident within the following three years than a driver with no traffic violations. Such a driver was subject to surcharge or cancellation. *Lumbermen's,* 302 Md. at 258–63, 487 A.2d 271.

ingly, we hold that the trial judge's finding that Medical Mutual's refusal to underwrite Magan's professional liability coverage was a violation of § 234A of the Insurance Code, and his reversal of the decision of the Insurance Commissioner were correct. § 40(5)(v).

### III.

After oral argument we received from Magan's attorney a letter dated April 24, 1987 which included House Bill 1523 and proposed amendments thereto from the 1987 Session of the General Assembly. Medical Mutual has moved to strike those documents because they do not properly constitute part of the record in this appeal. Rule 1026. We agree and shall grant the Motion to Strike.

JUDGMENT AFFIRMED; MOTION TO STRIKE GRANTED.

COSTS TO BE PAID BY APPELLANTS.